22-829-ag
*Soni v. Comm'r of Internal Revenue*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2022

No. 22-829-ag

OM P. SONI and ANJALI SONI,
*Petitioners-Appellants,*

v.

COMMISSIONER OF INTERNAL REVENUE,
*Respondent-Appellee.*

On Appeal from the United States Tax Court

ARGUED: APRIL 26, 2023
DECIDED: JULY 27, 2023
AMENDED: AUGUST 4, 2023

Before: CABRANES, LYNCH, and LOHIER, *Circuit Judges.*

Om P. Soni and Anjali Soni challenge the post-trial rulings of the United States Tax Court (Elizabeth A. Copeland, *Judge*) regarding their tax obligations for the 2004 tax year.  The Sonis argue that the Tax Court erroneously concluded that (1) they filed a valid joint return, (2) the Internal Revenue Service issued a statutory notice of deficiency before the limitations period for a tax assessment under I.R.C. §§ 6501(a) and (c)(4) expired, (3) they owed a $28,836 penalty pursuant to I.R.C. § 6651(a)(1) for filing a late tax return, and (4) they owed a $128,526 penalty pursuant to I.R.C. § 6662 for filing an inaccurate tax return.  We disagree and accordingly **AFFIRM** the Tax Court's January 7, 2022 decision.

———

JOHN MARK LANE (James O. Druker, *on the brief*), Lane Crowell LLP, Larchmont, N.Y., *for Petitioners-Appellants*.

IVAN C. DALE (Jacob Christensen, *on the brief*), *on behalf of* David A. Hubbert, Deputy Assistant Attorney General, Tax Division, Department of Justice, Washington, D.C., *for Respondent-Appellee.*

———

JOSÉ A. CABRANES, *Circuit Judge*:

Om P. Soni and Anjali Soni challenge the post-trial rulings of the United States Tax Court (Elizabeth A. Copeland, *Judge*) regarding their

2

tax obligations for the 2004 tax year. The Sonis argue that the Tax Court erroneously concluded that (1) they filed a valid joint return, (2) the Internal Revenue Service (the "IRS") issued a statutory notice of deficiency (the "Deficiency Notice") before the limitations period for a tax assessment[1] under Internal Revenue Code ("I.R.C.") §§ 6501(a) and (c)(4) expired, (3) they owed a $28,836 penalty pursuant to I.R.C. § 6651(a)(1) for filing a late tax return, and (4) they owed a $128,526 penalty pursuant to I.R.C. § 6662 for filing an inaccurate tax return. We disagree and accordingly **AFFIRM** the Tax Court's January 7, 2022 decision.[2]

## I. BACKGROUND[3]

### A. The Sonis

Om and Anjali Soni have been married for more than four decades and live in New York with their son, Kunal. During the

---

[1] A tax assessment "is 'essentially a bookkeeping notation' of what the taxpayer is required to pay the Government." *Chai v. Comm'r*, 851 F.3d 190, 218 (2d Cir. 2017) (quoting *Laing v. United States*, 423 U.S. 161, 170 n.13 (1976)); *see* I.R.C. § 6201(a) ("The Secretary is authorized and required to make the inquiries, determinations, and assessments of all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by this title, or accruing under any former internal revenue law, which have not been duly paid by stamp at the time and in the manner provided by law.").

[2] The Tax Court issued its January 7, 2022 decision "[p]ursuant to the determination of the [Tax] Court as set forth in its Memorandum Opinion filed December 1, 2021." Spec. App'x 42 (internal citation omitted).

[3] We recite pertinent facts drawn from the record on appeal, which are undisputed unless indicated otherwise.

relevant time period, Om worked as a businessman, while Anjali "took care of the home."[4]  Kunal worked for his father.

Om handled his family's finances.  Anjali did "not take part in the financial matters of the home" and "fully expected and trusted her husband to handle all financial affairs, including all the tax matters."[5]  Anjali was "generally aware of U.S. tax return filing requirements," but "never signed a tax return or asked anyone to sign a tax return for her."[6]  The Sonis assert that "Om would often give documents to Kunal" that required Anjali's signature, and Kunal would sign them.[7]  All of the Sonis' tax returns from 1999 through 2003, and from 2005 through 2014, were filed as joint returns.

## B.    The Sonis' 2004 Tax Return

The tax return at issue in this case is the Sonis' 2004 tax return (the "Return").  It claimed a loss deduction in excess of $1.7 million in association with the Beauville Corporation ("Beauville"), a Subchapter S corporation,[8] in which Om held an ownership interest but for which

---

[4] *Soni v. Comm'r*, 122 T.C.M. (CCH) 358, 2021 WL 5630890, at *1 (2021).

[5] *Id*. at *2; *see* J.A. 937 (Anjali testifying that she has trusted and will continue to "trust [her] husband to handle all [of] [her] tax matters").

[6] *Soni*, 2021 WL 5630890, at *2.

[7] *Id*.  For example, Kunal signed the Sonis' 2009–2014 joint returns on Anjali's behalf.

[8] "Subchapter S [of the I.R.C.] allows shareholders of qualified corporations to elect a 'pass-through' taxation system under which income is subjected to only one level of taxation."  *Gitlitz v. Comm'r*, 531 U.S. 206, 209 (2001).  Subchapter S

he failed to keep records. On the basis of that deduction, the Return claimed a $73,470 refund. Om personally signed the Return. Although Anjali's signed name appears on the Return, the parties stipulated that she did not "personally" sign it.[9] The Return was filed 24 days late.[10]

## C. The Extensions

The IRS began to "examine"[11] the Return and repeatedly sought the Sonis' consent to extend the date by which it had to complete its examination. A taxpayer can consent to such an extension through a Form 872, Consent to Extend the Time to Assess Tax, or one of its

corporations therefore permit corporate-level profits, losses, and deductions to "pass through directly to its shareholders on a pro rata basis and are reported on the shareholders' individual tax returns." *Id.*

[9] J.A. 119 (listing stipulated facts).

[10] The Return was due on October 17, 2005, but it was not mailed until November 10, 2005. *See* I.R.C. § 7502(a)(1) (stating that the date a return is postmarked "shall be deemed to be the date of delivery or the date of payment").

[11] I.R.C. § 7602(a) ("For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary is authorized . . . (1) [t]o examine any books, papers, records, or other data which may be relevant or material to such inquiry."); *see also id.* § 6501(c)(4)(A) ("Where, before the expiration of the time prescribed for the assessment of any tax imposed by this title . . . both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.").

variants.  A representative can consent on behalf of a taxpayer through Form 2848.[12]

On March 20, 2008, the IRS received two documents pertaining to its examination of the Return: (1) a Form 2848, authorizing Alan Grossman—Beauville's accountant—to act as the Sonis' representative throughout the examination, and (2) a signed Form 872 that the IRS had previously sent to the Sonis seeking an extension of the examination period (the "First Form 872").  The Form 2848, signed on April 10, 2006, contained the signatures for Om, Anjali, and Grossman.  Anjali did not personally sign it,  and the parties dispute whether Om personally signed it.[13]   Although the First Form 872, signed by Grossman as the Sonis' representative, was dated March 20, 2006, an IRS appeals officer noted during his review of the Return that Grossman "actually signed in 2008."[14]

In total, the IRS received eight signed extension forms, facially extending the limitations period for examining the Return from November 14, 2008, to December 31, 2015.  Grossman signed his name, Om's name, and Anjali's name on a second extension form (the

---

[12] *See, e.g.*, *Madison Recycling Assocs. v. Comm'r*, 295 F.3d 280, 283, 286 (2d Cir. 2002).

[13] As discussed *post*, the Tax Court found that Om personally signed the Form 2848, despite his protestations to the contrary.  *Soni*, 2021 WL 5630890, at *9.

[14] *Id*. ("Appeals Officer Gerard Fitzgerald found that Mr. Grossman actually signed in 2008.") (internal quotation marks omitted).  As discussed *post*, the Tax Court found that March 20, 2006, was a "scrivener's error," and that the intended date was March 20, 2008.  *Id*. at *11.

"Second Form 872").  The remaining six extension forms bore only Om and Anjali's signatures, although Kunal had signed Anjali's name.

## D.    The Statutory Notice of Deficiency

Following its examination of the Return, the IRS concluded that the Sonis failed to produce evidence supporting the Return's claimed $1.78 million loss from Beauville.[15]  The IRS therefore determined that the Sonis were not entitled to claim the loss and issued the Deficiency Notice on March 12, 2015.  The Deficiency Notice informed the Sonis that they were jointly and severally liable for (1) an additional $642,629 in tax for 2004 due to the disallowance of the $1.78 million loss from Beauville claimed by the Sonis, and (2) a $28,835 penalty under I.R.C. § 6651(a)(1)[16] for their failure to timely file the Return.

On June 15, 2015, the Sonis timely filed a petition in the Tax Court disputing the Deficiency Notice.[17]  In an amended answer, the

---

[15] Specifically, Om was unable to provide documentation verifying his basis in Beauville.  A shareholder can only "take corporate losses and deductions into account on his personal tax return to the extent such items exceed his basis in the stock and debt of the S corporation."  *Gitlitz*, 531 U.S. at 209.

[16] Section 6651(a)(1) provides in relevant part that "[i]n case of failure . . . to file any return . . . on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is not more than 1 month."  I.R.C. § 6651(a)(1).

[17] Although the Sonis checked the box on the petition form for disputing a "Notice of Determination Concerning Your Request for Relief" rather than a

7

IRS asserted that the Sonis owed an additional $128,526 "accuracy-related penalty" pursuant to I.R.C. § 6662 that was not previously part of the Deficiency Notice.[18]

### E.    The Tax Court's Decision

On March 14, 2019, the Tax Court held a single-day bench trial at which counsel represented the Sonis and witnesses testified and were cross examined. It subsequently ruled that (1) the Return was jointly filed, (2) the IRS issued the Deficiency Notice before the limitations period on the assessment of tax under I.R.C. §§ 6501(a) and (c)(4) expired, (3) the Sonis were subject to a late-filing penalty of $28,836 under I.R.C. § 6651(a)(1), and (4) the Sonis were subject to an accuracy-related penalty of $128,526 pursuant to I.R.C. § 6662. The Sonis timely appealed.

## II.    DISCUSSION

On appeal, the Sonis contend that the Tax Court erroneously decided that (1) the Return was jointly filed, (2) the IRS issued the Deficiency Notice before the expiration of the limitations period, (3)

---

"Notice of Deficiency," the petition only references the IRS's Deficiency Notice of March 12, 2015. J.A.18.

[18] Section 6662 imposes an "accuracy-related penalty on underpayments" of "20 percent of the portion of the underpayment." I.R.C. § 6662(a). As relevant, Section 6662 applies only to the "portion of any underpayment which is attributable to . . . [n]egligence or disregard of rules or regulations" or a "substantial understatement of income tax." *Id.* § 6662(b)(1)–(2). It does not apply "if it is shown that there was a reasonable cause for such [underpayment] and that the taxpayer acted in good faith with respect to such [underpayment]." *Id.* § 6664(c)(1).

they were subject to the late-filing penalty under I.R.C. § 6651(a)(1), and (4) they were subject to the accuracy-related penalty under I.R.C. § 6662.

We address each argument in turn, "review[ing] the legal rulings of the Tax Court *de novo* and its factual determinations for clear error."[19]

## A.    Joint Return

We first consider whether the Tax Court clearly erred in determining that the Sonis filed a valid joint tax return. "It is well settled in this Circuit that the determination that income tax returns are joint is a factual issue of the intention of the parties and must be affirmed unless clearly erroneous."[20] And "[w]hile a [spouse]'s failure to sign the return does not preclude a finding of a joint return, it removes the presumption of correctness ordinarily attaching to the [IRS's] determination of jointness."[21] Where, as here,[22] the return excludes one spouse's signature, the IRS bears the "burden of producing additional evidence on the issue" of "the intention of the parties."[23]

---

[19] *Scheidelman v. Comm'r*, 682 F.3d 189, 193 (2d Cir. 2012).

[20] *O'Connor v. Comm'r*, 412 F.2d 304, 309 (2d Cir. 1969) (citation omitted).

[21] *Id.* (citation omitted).

[22] Both parties agree that Anjali never signed the return.

[23] *O'Connor*, 412 F.2d at 309.

9

Evidence of intent will vary depending on the circumstances presented. For example, in *O'Connor v. Commissioner of Internal Revenue*, we concluded that a married couple intended to file jointly—despite the absence of one spouse's signature on several returns—where the IRS produced evidence that (1) the non-signing spouse knew "that a return had to be filed";[24] (2) the non-signing spouse knew of the signing spouse's "expert knowledge of the requirements for preparing and filing tax returns";[25] (3) the spouses filed a "joint petition in the Tax Court";[26] (4) the spouses asserted only a "delay[ed]" challenge to the IRS's characterization of a return as "joint";[27] (5) the "return in [one spouse's] name alone actually included both [spouses'] income and deductions";[28] and (6) the non-signing spouse had "substantial gross income."[29]

At least the first four circumstances we identified as probative of the taxpayers' intent in *O'Connor* are present here. First, Anjali knew "a return had to be filed"[30] because "[s]he was generally aware

---

[24] *Id.*

[25] *Id.*

[26] *Id.* at 309.

[27] *Id.* at 309–10.

[28] *Id.* at 309. We emphasized that this factor, "standing alone," would not satisfy the IRS's burden. *Id.*

[29] *Id.*

[30] *Id.*

of the U.S. tax system but chose not to engage."[31]  Second, Anjali knew of Om's "expert knowledge"[32] because he was an experienced businessman and she "chose to trust [his] handling of their family's finances, which included [the] preparation and filing of their returns, including the [Return]."[33]  Third, the Sonis filed a joint petition in the Tax Court.  And fourth, Anjali only belatedly challenged the IRS's characterization of the Return as "joint," not having "disavow[ed]" its "joint status" until trial.[34]  Beyond the circumstances present both in *O'Connor* and here, the fact that the Sonis filed a joint tax return for every year from 1999 through 2003, and from 2005 through 2014, further supports a finding that the Sonis intended to file jointly.

Based on the above-mentioned circumstances, the Tax Court did not err, much less clearly err, in finding that the Sonis intended to file the Return jointly.[35]

---

[31] *Soni*, 2021 WL 5630890, at *7.

[32] *O'Connor*, 412 F.2d at 309.

[33] *Soni*, 2021 WL 5630890, at *6.

[34] *Id.* at *7.

[35] The Sonis principally argue that because Anjali did not sign her name on the Return, it was clear error for the Tax Court to find that the Sonis intended to file a joint return.  That argument misses the mark.  The issue is not whether Anjali was aware that someone signed her name for her; it is whether she (and Om) intended to *file* the Return jointly.

11

## B.  The Deficiency Notice

We next consider whether the Tax Court erred in ruling that the IRS issued the Deficiency Notice before the limitations period expired.

After receiving a taxpayer's return, the IRS may examine the return and "determine whether the taxpayer understated his tax obligation and should be assessed a deficiency."[36]  As a "[g]eneral rule[,] . . . the amount of any tax imposed . . . shall be assessed within 3 years after the return was filed."[37]  "An exception to this limitations period is provided where the [IRS] and the taxpayer consent in writing to an extension of time."[38]  The IRS must obtain the taxpayer's consent before the limitations period expires.  It does so by having either the taxpayer or the taxpayer's authorized representative sign a Form 872 or one of its variants.[39]  In the context of a joint return, "each [taxpayer] ha[s] the authority to extend the period of limitations on assessment and collection of a tax independent of action by the other."[40]

---

[36] *Bufferd v. Comm'r*, 506 U.S. 523, 527 (1993).

[37] I.R.C. § 6501(a).

[38] *Bufferd v. Comm'r*, 952 F.2d 675, 676–77 (2d Cir. 1992), *aff'd*, 506 U.S. 523 (1993).

[39] I.R.C. § 6501(c)(4)(A); *see, e.g., Madison Recycling Assocs.*, 295 F.3d at 283, 286.

[40] *Tallal v. Comm'r*, 77 T.C. 1291, 1295 (1981), *aff'd*, 778 F.2d 275 (5th Cir. 1985).

Accordingly, if one of the taxpayers does *not* consent, then the limitations period may expire as to that taxpayer.[41]

The IRS bears the burden "to show that a valid extension of the period of limitations was executed."[42]  Here, the Tax Court decided that the IRS satisfied that burden.  The IRS received eight Forms 872 within the limitations period, facially extending the limitations period for examining the Return to December 31, 2015.  And it issued the Deficiency Notice on March 12, 2015, well within that limitations period.

Because the IRS satisfied its burden "to show that a valid extension of the period of limitations was executed,"[43] the burden shifted to the Sonis to prove that the limitations period had in fact expired before the IRS issued the Deficiency Notice.[44]  Contrary to the Tax Court's finding, the Sonis contend that they satisfied their burden.  They raise a litany of arguments in support of this contention.  One set of arguments pertains to the initial two extensions.  The other set pertains to the later six extensions.  We address each set in turn.

---

[41] *Id*. at 1295–96 (concluding that the extension signed by only one spouse was invalid as to the non-signing spouse).

[42] *Hernandez v. Comm'r*, 75 T.C.M. (CCH) 1714, 1998 WL 44090, at *4, *on reconsideration*, 76 T.C.M. (CCH) 440 (1998); *see also Madison Recycling Assocs.*, 295 F.3d at 286 (referring to "the burden of production [on] . . . the Commissioner to show that the bar of the limitations period is not applicable").

[43] *Hernandez*, 1998 WL 44090, at *4.

[44] *Id.*

13

### 1. The First Two Extensions

We begin with Om's arguments that the first two extensions were invalid as to him and then address Anjali's arguments that they were invalid as to her.

### a) The First Two Extensions as to Om

Om contends that Grossman (1) "forged"[45] his signature on the Form 2848 authorizing Grossman to act on Om's behalf, and (2) that, in any event, Grossman had no authority to sign the First Form 872 on his behalf because it predates the Form 2848.

First, as to the alleged "forgery," the Tax Court made a factual finding that Om personally signed the Form 2848 authorizing Grossman to act as his representative. Although Om denies signing the Form 2848, the Tax Court found Om not credible.[46] We owe "particularly strong deference" to the Tax Court's credibility determinations.[47] Moreover, the Tax Court determined that "Om's signature on the Form 2848 is similar to those he admits are his."[48] We find no error, much less clear error, in the Tax Court's factual finding

---

[45] Pet'rs' Br. 23.

[46] *Soni*, 2021 WL 5630890, at *9 n.17.

[47] *Am. Valmar Int'l Ltd., Inc. v. Comm'r*, 229 F.3d 98, 101 (2d Cir. 2000) (quoting *Mathie v. Fries*, 121 F.3d 808, 812 (2d Cir. 1997)).

[48] *Soni*, 2021 WL 5630890, at *9.

that Om signed the Form 2848. Accordingly, we agree with the Tax Court that Grossman had authority to act as Om's representative.

Second, the Tax Court found that Grossman signed the First Form 872 *after* he had authority to act as Om's representative pursuant to the Form 2848. The Form 2848 is dated April 10, 2006. But because Grossman's signature on the First Form 872 is dated March 20, 2006, it appears to predate the executed Form 2848. Based on this sequence, the Sonis contend that Grossman had no authority to sign the First Form 872 extending the limitations period.

The Tax Court, however, concluded that the date on the First Form 872 was a "scrivener's error," in which Grossman "mistakenly dated his signature" March 20, 2006, "when he meant March 20, 2008."[49] The Tax Court reasoned that the First Form 872 was sent to the Sonis on May 16, 2007, and it was thus "factually impossible for Mr. Grossman to have signed it in 2006."[50] We find no clear error in that factual finding and affirm the Tax Court's conclusion that Grossman had the authority to act as Om's representative when he signed both the First and Second Forms 872.

In sum, Om failed to carry his burden to prove that the first two extensions were invalid as to him.

---

[49] *Id.* at *11.

[50] *Id.* The Sonis' contention that the scrivener's error determination was "pure speculation" ignores the evidence cited by the Tax Court supporting its "scrivener's error" finding. *See* Pet'rs' Br. 26–27.

15

**b)      The First Two Extensions as to Anjali**

The parties agree that Anjali did not personally sign the Form 2848.  Anjali argues that, as a result, the First and Second Forms 872 are invalid as to her because Grossman lacked authority to sign those forms as her representative.  As we explain below, the Tax Court's ruling that, under agency principles, Grossman was authorized to sign these forms as Anjali's representative was not erroneous. [51]

An agency relationship exists if there are "facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent." [52]  If an agency relationship exists, then "the authority of an agent 'is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the

---

[51] The Tax Court also determined that the first two extensions were valid as to Anjali because she ratified Grossman's representation.  *Soni*, 2021 WL 5630890, at *10–12.  Because we affirm the Tax Court's ruling that Grossman had authority to act as Anjali's representative under agency principles, we do not address its ratification conclusion.

[52] *Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003).

"Whether an agency relationship exists is a mixed question of law and fact." *Id*.  We review "mixed questions of law and fact in a case on review from the Tax Court . . . *de novo* to the extent that the alleged error is in the misunderstanding of a legal standard and clear error to the extent the alleged error is in a factual determination." *Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 174 (2d Cir. 2013).

16

principal's manifestations to him."[53] The agent's "authority may be express or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act."[54]

First, we affirm the Tax Court's conclusion that an agency relationship existed between Om and Anjali. As the Tax Court found, Anjali (1) "was generally aware of U.S. tax return filing requirements" and that she and Om "were paying tax"; (2) "never signed a tax return or asked anyone to sign a tax return for her"; and (3) "fully expected and trusted [Om] to handle all financial affairs, including all tax matters."[55] In addition, "Om handled all financial affairs" and "did not discuss financial, business, or tax issues with Anjali."[56] These factual findings—which the Sonis do not contest[57]—are "sufficient to show" that Anjali intended for her husband to handle her tax matters and that Om agreed to do so.[58] Accordingly, the Tax Court correctly

---

[53] *Minskoff v. Am. Express Travel Related Servs. Co., Inc.*, 98 F.3d 703, 708 (2d Cir. 1996) (quoting Restatement (Second) of Agency § 7 cmt. a (Am. L. Inst. 1958)).

[54] *Id.*

[55] *Soni*, 2021 WL 5630890, at *2.

[56] *Id.* at *1.

[57] *See* Pet'rs' Br. 28–33.

[58] *Com. Union Ins.*, 347 F.3d at 462.

determined that Om was Anjali's agent with regard to all matters pertaining to the Return.[59]

Second, we affirm the Tax Court's conclusion that Om had implied authority to appoint Grossman to act on Anjali's behalf. True, Anjali never expressly authorized Om to appoint Grossman to act on her behalf. But it is not disputed that Anjali "relied on her husband to handle financial and tax matters." [60] That is, Anjali gave Om implied authority to handle any tax matter pertaining to her. Based on this implied authority, Om could "reasonably infer" that Anjali would consent to his appointment of Grossman to act on Anjali's behalf with regard to the Return.[61] In sum, Anjali failed to carry her burden to prove that the first two extensions were invalid as to her.

---

[59] The Sonis contend that the Tax Court erred by improperly extending the "tacit consent rule" to find an agency relationship between Om and Anjali. Pet'rs' Br. 32. The Tax Court, however, did not rely on the tacit consent rule to find an agency relationship between Om and Anjali. It is apparent that the Tax Court used the term "tacit consent" interchangeably with "implied authority." *See Soni*, 2021 WL 5630890, at *11 ("Anjali gave her husband *tacit consent* to take care of the tax matters, and we might be able to rely on *that authority* to conclude Om authorized Mr. Grossman's representation for Anjali." (emphases added)).

[60] *Soni*, 2021 WL 5630890, at *13.

[61] *See* Restatement (Third) Agency § 3.15 cmt. c (Am. L. Inst. 2006) ("An agent has actual authority to create a relationship of subagency when the agent reasonably believes, based on a manifestation from the principal, that the principal consents to the appointment of a subagent. . . . A principal's consent to the appointment of a subagent may be express or implied."); *see also Soni*, 2021 WL 5630890, at *6 n.12 (recounting Anjali's testimony that, "when asked if she trusted her husband to handle all of the tax issues," she responded, "I did. I do. I will.").

18

## 2. The Later Six Extensions

We turn now to the later six extensions.

As to Om, the parties agree that he personally signed each of the remaining Forms 872.  As a result, the later six extensions are valid as to him.

As to Anjali, Kunal signed the remaining six Forms 872 for her. Anjali maintains that, like the first two extensions, these later six extensions were invalid as to her because "[t]here was no evidence at trial that [she] consented in any way to have her name signed . . . to any . . . document."[62]  We have already concluded that the first two extensions were valid as to Anjali based on Om's implied authority to handle all tax matters on Anjali's behalf.  The same principle militates in favor of the conclusion that the later six extensions are also valid. Anjali does not explain why Om could not have tasked Kunal (as he had tasked Grossman) with ensuring that necessary tax-related paperwork was completed. [63]

---

[62] Pet'rs' Reply Br. 4; *see also* Pet'rs' Br. 33.

[63] *See* note 61, *ante*.

## C.     The Late-Filing Penalty

We next consider whether the Tax Court erred in determining that the Sonis are subject to a late-filing penalty of $28,836 under I.R.C. § 6651(a)(1).[64]

"A failure to file a tax return on the date prescribed leads to a mandatory penalty unless the taxpayer shows that such failure was due to reasonable cause and not due to willful neglect."[65]   The IRS bears the initial burden of production to show that the return was filed after the due date.[66]  Here, the IRS established—and the Sonis do not dispute—that the Sonis filed the Return 24 days late.[67]  Because the IRS satisfied its burden, the Sonis bore the "heavy burden" to prove both that the failure (1) "was 'due to reasonable cause'" and (2) "did not result from 'willful neglect.'"[68]

---

[64] *See* note 16, *ante* (providing relevant text of § 6651(a)(1)).

[65] *McMahan v. Comm'r*, 114 F.3d 366, 368 (2d Cir. 1997) (citing I.R.C. § 6651(a)(1)).

[66] I.R.C. § 7491(c) ("Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title.").

[67] The Return was due on October 17, 2005, but it was not mailed until November 10, 2005.

[68] *United States v. Boyle*, 469 U.S. 241, 245 (1985) (quoting I.R.C. § 6651(a)(1)). "Whether a factor constitutes 'reasonable cause' for late filing under § 6651(a)(1) is reviewed *de novo*.  Whether a factor is present in a particular case is reviewed for

A taxpayer establishes "reasonable cause" if the taxpayer "exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time."[69] Here, the Tax Court found that the Sonis "thought no harm no foul" for a late filing "because they would have zero tax due."[70] We agree with the Tax Court that, in the circumstances presented here, this explanation "is not a reasonable cause for the delay" and that, "[c]onsequently, no reasonable cause exists."[71]

We may affirm the Tax Court's conclusion that the Sonis are liable for the late-filing penalty on the basis that the Sonis failed to establish "reasonable cause" for their delay. In any event, the Sonis also failed to prove that their delayed return "did not result from 'willful neglect.'"[72] They merely argue that the Tax Court committed reversible error because it "did not even purport to find . . . willful neglect."[73] But under the Internal Revenue Code, it was the *Sonis'*

---

clear error." *Marrin v. Comm'r,* 147 F.3d 147, 152 (2d Cir. 1998) (quoting *McMahan,* 114 F.3d at 369)).

[69] Treas. Reg. § 301.6651(c)(1) (2022); *see also Boyle,* 469 U.S. at 245.

[70] *Soni,* 2021 WL 5630890, at *13.

[71] *Id.*

[72] *Boyle,* 469 U.S. at 245 (quoting I.R.C. § 6651(a)(1)).

[73] Pet'rs' Br. 45–46.

burden to prove *lack* of willful neglect.[74]   The Tax Court had no obligation to "find" willful neglect. [75]

We accordingly affirm the Tax Court's conclusion that the Sonis are subject to a Section 6651(a)(1) late-filing penalty of $28,836.

## D.   The Inaccuracy Penalty

Finally, we turn to the question of whether the Tax Court erred in concluding that the Sonis are subject to a penalty of $128,526 for filing an inaccurate tax return under I.R.C. § 6662.

Section 6662 imposes "a 20% accuracy-related penalty on any portion of an underpayment that is attributable to, *inter alia*, (1) '[n]egligence or disregard of rules or regulations' or (2) '[a]ny substantial understatement of income tax.'"[76]   Under I.R.C. § 6664(c)(1), however, a taxpayer is not subject to the penalty if the taxpayer "show[s] that there was a reasonable cause [for the

---

[74] *See Boyle*, 469 U.S. at 245 ("To escape the penalty, the taxpayer bears the heavy burden of proving both (1) that the failure did not result from 'willful neglect,' and (2) that the failure was 'due to reasonable cause.'" (quoting I.R.C. § 6651(a)(1))).

[75] "As used [in Section 6651(a)(1)], the term 'willful neglect' may be read as meaning a conscious, intentional failure or reckless indifference." *Boyle*, 469 U.S. at 245.  Before the Tax Court, the Sonis only conclusorily stated that their late filing was not due to willful neglect. *See* Pet'rs' T.C. Opening Br. 23–24; Pet'rs' T.C. Answering Br. 21–22.

[76] *Curcio v. Comm'r*, 689 F.3d 217, 224 (2d Cir. 2012) (alterations in original) (quoting I.R.C. § 6662(b)(1)–(2)).

inaccuracy] and that the taxpayer acted in good faith."[77]   "Under [Treasury] regulations, the existence of reasonable cause is determined 'on a case-by-case basis, taking into account all pertinent facts and circumstances,'"[78] including "the experience, knowledge, and education of the taxpayer."[79]  Reasonable reliance upon the advice of a tax professional may establish reasonable cause and good faith.[80]

On appeal, the Sonis argue that they are not subject to the penalty because they established reasonable cause for the inaccuracy and they acted in good faith by relying on the advice of accountants.[81]

---

[77] *Id.* at 225 (quoting I.R.C. § 6664(c)(1)).  "We review the tax court's factual determinations of whether a taxpayer qualifies for the reasonable cause exception for clear error[,] . . . but we review *de novo* whether those determinations were sufficient to satisfy the elements of reasonable cause."  *Thompson v. Comm'r*, 499 F.3d 129, 134 (2d Cir. 2007) (internal quotation marks and citation omitted).

[78] *Id.* (quoting Treas. Reg. § 1.6664-4(b)(1)).

[79] Treas. Reg. § 1.6664-4(b)(1).

[80] *Id.* § 1.6664-4(c); *see also Thompson*, 499 F.3d at 135 ("[R]eliance on an expert's opinion 'may not be reasonable or in good faith if the taxpayer knew, or reasonably should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law.'" (quoting Treas. Reg. § 1.6664–4(c)(1))).

[81] The Sonis separately argue that "[t]here are no findings or conclusions at all relating to Anjali to support the imposition of an accuracy-related penalty as against her."  Pet'rs' Br. 47.  That argument fails because it was Anjali's burden to "show[] that there was a reasonable cause for [the inaccuracy] and that [she] acted in good faith."  *Curcio*, 689 F.3d at 225; *see also ATL & Sons Holdings, Inc. v. Comm'r*, 152 T.C. 138, 154 n.8 (2019) ("Once the [IRS] carries the burden of production, *the taxpayer must come forward with persuasive evidence* that the [IRS's] determination is incorrect or that the taxpayer had an affirmative defense, such as reasonable cause and good faith." (emphases added)).

23

We disagree. The inaccuracy did not have a reasonable cause. As the Tax Court observed, Om, an experienced, educated businessman, knew "he should have kept records of the Beauville Corp."[82] Yet, as Om admitted, he failed to do so. The inaccuracy was also not the product of reasonable reliance upon the advice of a tax professional. As the Tax Court also found, the Sonis failed to provide their accountants "necessary and accurate information."[83] Moreover, the record includes evidence that Om disregarded the advice of accountants who warned him that he would need proof to substantiate the claimed loss.

On these facts, the Tax Court did not err in concluding that the Sonis are subject to an inaccuracy penalty of $128,526 pursuant to I.R.C. § 6662.

### III.   CONCLUSION

To summarize, we hold as follows:

(1) The Tax Court did not clearly err in its finding that the Sonis intended to jointly file the Return.

(2) The IRS issued the Deficiency Notice within the limitations period for the tax assessment.

---

[82] *Soni*, 2021 WL 5630890 at *14.

[83] *Id*.

(3) The Sonis are subject to a $28,836 late-filing penalty under I.R.C. § 6651(a)(1).

(4) The Sonis are subject to a $128,526 accuracy-related penalty under I.R.C. § 6662.

The Tax Court's decision of January 7, 2022 is therefore **AFFIRMED**.